Pages 1 - 15

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

THERANOS, INC.,

Plaintiff,

VS.

BECTON, DICKINSON AND COMPANY,

Defendant.

NO. C 14-4880 WHA

San Francisco, California
Thursday
March 12, 2015
11:00 a.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiff**:

FENWICK & WEST
555 California Street
12th Floor
San Francisco, California 94104
**BY: JEDEDIAH WAKEFIELD, ESQ.**
**SEAN WIKNER, ESQ.**

BOIES, SCHILLER & FLEXNER
575 Lexington Avenue
New York, New York 10022
**BY: PARKER BAGLEY, ESQ.**

BOIES, SCHILLER & FLEXNER
1999 Harrison Street
Suite 900
Oakland, California 94612
**BY: MEREDITH DEARBORN, ESQ.**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:* ***Debra L. Pas, CSR 11916, CRR, RMR, RPR***
*Official Reporter - US District Court*
*Computerized Transcription By Eclipse*

**APPEARANCES: (CONTINUED)**

**For Defendant:** FROSS ZELNICK LEHRMAN & ZISSU, PC
866 United Nations Plaza
Sixth Floor
New York, New York 10017
**BY: JOHN MARGIOTTA, ESQ.**

_ _ _

**P R O C E E D I N G S**

**March 12, 2015** **11:35 a.m.**

**THE COURT:** We now have come to Theranos versus Becton, Dickinson and Company, 14-4880.

**MR. WAKEFIELD:** Good morning, your Honor. Jed Wakefild of Fenwick & West on behalf of Theranos, Inc. With me today is my colleague, Sean Wikner.

**THE COURT:** All right. So you represent which side?

**MR. WAKEFIELD:** Theranos, the declaratory judgment plaintiff and counter claimed defendant.

**THE COURT:** So you're the one asserting the patent?

**MR. WAKEFIELD:** I think we are reversed. We're DJ plaintiff. We're the ones accused of infringement.

**THE COURT:** All right. You're the accused infringer?

**THE CLERK:** Plaintiffs go to the other side.

**THE COURT:** My clerk knows how confused I get so easily.

All right. So you're the declaratory judgment plaintiff, but you're actually the accused infringer. You are the one with the plan. How many patents are there?

**MR. WAKEFIELD:** Trademark, your Honor.

**THE COURT:** Trademark. Oh, that's right.

**MR. WAKEFIELD:** So we will be much more reasonable than patent lawyers.

**THE COURT:** As a general rule, that is true.

**THE CLERK:** Counsel, can you finish making your appearances, please?

**MR. BAGLEY:** Parker Bagley from Boise Schiller also on behalf of Theranos. With me is Meredith Dearborn from our office.

**THE COURT:** Meredith Dearborn. Meredith Dearborn. I know you. I need to let you all know I'm pretty good friends with Meredith Dearborn and I know her dad. So if somebody wants to move to disqualify, be my guest. I'll refer it to somebody else.

I have a high opinion of Meredith Dearborn, so you need to think about whether you want to move to knock me out of the case. I will let another judge decide.

All right. Let me read this again.

(Brief pause.)

**THE COURT:** What is the mark that is an issue here?

**MR. WAKEFIELD:** The defendant slash trademark plaintiff's mark is MICROTAINER. And my client Theranos uses the mark NANOTAINER.

**THE COURT:** Okay. Is it used in a confusing similar way?

**MR. WAKEFIELD:** We don't believe so, your Honor.

**THE COURT:** Are the products similar?

**MR. WAKEFIELD:** They are used in the broadest sense in the related field of blood collection analysis, but they are

used quite differently in the market and marketing channels through which they are marketed, how consumers experience the brands.

**THE COURT:** You don't happen to have exemplars here, do you?

**MR. WAKEFIELD:** We don't.

**THE COURT:** Just so I can see what one looks like?

**MR. WAKEFIELD:** I -- we could submit a photo.

**THE COURT:** Just describe it. Is it like a bottle, like a vial of some kind of medicine?

**MR. WAKEFIELD:** What's actually revolutionary about Theranos and the NANOTAINER is how small it is. Unlike traditional blood draws, where you go to a separate lab --

**MR. BAGLEY:** A picture is worth a thousand words.

**MR. WAKEFIELD:** Co-counsel has a photo we can hand up, with the Court's permission.

**THE COURT:** Show it to counsel first.

(Photograph was shown to the counsel.)

**THE COURT:** Have you seen it? Just hand it to the clerk.

(Photograph was tendered to the Court.)

**THE COURT:** All right. So is this the accused product?

**MR. WAKEFIELD:** That's the product in connection with --

**THE COURT:** So for the record, I see a finger or a thumb maybe. Is that a thumb? I can't tell.

**MR. WAKEFIELD:** I think it's a fingertip, your Honor.

**THE COURT:** It is, but I can't tell if it's a thumb. Anyway, on top of that is a small test tube with a cap in the top. It's half full of red fluid.

So I'm going to guess that that thing is a quarter of an inch long and maybe, I don't know, a 16th of an inch wide.

And what is that inside it?

**MR. WAKEFIELD:** It's supposed to be blood.

**THE COURT:** Is that blood? Is it drawing blood or is it putting blood into the person?

**MR. WAKEFIELD:** It's capillary blood drawn from the fingertip. It's a sample for testing.

And unlike traditional lab work where large vials are used and sent off for expensive analysis, with Theranos' NANOTAINERS on the -- on-site testing can be done with a much smaller amount of blood.

**THE COURT:** I don't know why -- that looks very painful, that you would stick that thing into the end of your finger like that. Is that how it works or is this just to show the size?

**MR. WAKEFIELD:** I believe that's an illustration of the size, your Honor --

**THE COURT:** All right. So it's not actually sticking

-- it leaves the impression that you're sticking that in, like a needle in the end of your finger, which I don't think I would want to do.

**MR. MARGIOTTA:** In fact, your Honor, what they are sticking in the finger is BD's products, which is the lancet sold under the MICROTAINER mark. So they are actually using BD's product, my client, sticking a finger and then collecting that vial, and that vial is virtually indistinguishable from the same vial that BD sells under it's MICROTAINER mark.

**THE COURT:** So BD -- there really is a needle going into the finger?

**MR. MARGIOTTA:** It is -- they call it a lancet. It's really not a needle.

Have you ever had blood drawn from your finger?

**THE COURT:** I have many times.

**MR. MARGIOTTA:** They just sort of stab it and then squeeze.

**THE COURT:** It's always done on my arm in my elbow area, not at the end of my finger.

**MR. MARGIOTTA:** The difference is what he was explaining before. There is a venous draw, which is what's most common, but then there are patients who have compromised veins.

So Theranos hasn't introduced any kind of new technology in the sense of introducing capillary blood collection. It's

been around for a very long time. You see it in elderly with compromised veins, preemies, infants, small children. And instead of wherever you can, instead of drawing from the vein, you jab the finger and you push out blood from there, collect it.

**THE COURT:** So it is stuck into the finger.

**MR. MARGIOTTA:** But not the vial.

**THE COURT:** Not the vial, but the tiny little needle that I can't see in that picture.

**MR. MARGIOTTA:** Exactly, your Honor.

**THE COURT:** I've got the idea now.

All right. So you call your product -- does your product look similar to that product?

**MR. MARGIOTTA:** The vial collection looks very similar.

**THE COURT:** All right. So yours is MICROTAINER, and theirs is NANOTAINER.

When did yours come on the market?

**MR. MARGIOTTA:** We have been around for decades, your Honor. It's a very well established mark. We do about $25 million in business over the year. It's a premier product for our client in the blood draw industry. And we are very, very well known in certain segments; namely, the pediatric, the elderly, hospitals. It's a very, very well-established product.

We do those sales on very little at this point advertising or promotion because it has such a very dedicated and trusted name and it's been around for so long.

**THE COURT:** NANOTAINER, when did it come on the market?

**MR. MARGIOTTA:** It has just started on the market, I would say, within the last year.

**THE COURT:** Well, is it the "TAINER" part that you object to?

**MR. MARGIOTTA:** It's the entire commercial impression. I honestly, your Honor --

**THE COURT:** What if they called it "pinprick"?

**MR. MARGIOTTA:** We would have no issue with that at all, your Honor.

**THE COURT:** So even if it did the same thing as the picture. So it is the name, the name of the mark that they are using is what you object to.

**MR. MARGIOTTA:** Absolutely.

**THE COURT:** So it's -- well, so it's "TAINER." It's got to be "TAINER" because "NANO" is not the same. So "TAINER" must be what you object to.

**MR. MARGIOTTA:** Except that "NANO" has the same, we believe, the same commercial impression. So in trademarks --

**THE COURT:** You mean "NANO" is small and "MICRO" is small.

**MR. MARGIOTTA:** Exactly. And there is a test on trademarks --

**THE COURT:** What if they call it a Tinytainer? How about that? Tinytainer. That would be small and "tainer" in there, too.

**MR. MARGIOTTA:** That may be a problem also, your Honor. There is case law saying, for instance, "hurricane" and "tornado." They leave the same commercial impression on the potential consumer. So they can't remember -- I remember it meant tiny tainer, that type of thing.

And, again, we have been around since the -- I believe the first use is 1970. This is a very, very well-established --

**THE COURT:** All right. I don't know the law on this at all. I'm going to learn if that's true.

So you're really saying that you get a monopoly on the -- all versions of small plus "tainer."

**MR. MARGIOTTA:** Not a monopoly, your Honor. I can't -- I don't, off the top of my head, know what would be acceptable, but, certainly, the first example, if you want to call it "Pinpricktainer," I don't think the client would necessarily have a problem with that. "Tinytainer" might be different.

**MR. WAKEFIELD:** And, your Honor, we think, your Honor, the Court has hit the nail on the head; that they are seeking a monopoly on "tainer" suffix marks for small blood

collection devices. We don't think trademark law gives them that scope of protection. I think --

**THE COURT:** I don't know.

**MR. WAKEFIELD:** -- MICROTAINER is a very weak mark.

**THE COURT:** Is that what the case comes down to, this one issue?

**MR. WAKEFIELD:** Well, it comes down to likelihood of confusion. First it comes down to the protectability of the MICROTAINER mark in the first instance.

**THE COURT:** Why wouldn't it be protectable?

**MR. WAKEFIELD:** Because we believe it has become generic for small blood collection tubes and is not associated as being a brand with B.D., but rather --

**THE COURT:** Like the old thing that Kleenex did. Kleenex was a -- or Xerox, what Xerox was always worried about.

**MR. WAKEFIELD:** It's more like aspirin or escalator, which ones were trademarks and now are not and that where the majority of --

**THE COURT:** Is that a jury issue or is that a judge issue?

**MR. WAKEFIELD:** Depends on whether there is a question of fact, but traditionally that would go to --

**MR. MARGIOTTA:** Generalism can be determined on summary judgment.

**MR. WAKEFIELD:** It can be determined on summary

judgment.

**MR. BAGLEY:** It's like likelihood of confusion. It's fact intensive, but where the facts are so overwhelming in one direction.

**THE COURT:** Have I given you your schedule yet?

**MR. BAGLEY:** No.

**MR. MARGIOTTA:** No, your Honor.

**THE COURT:** Let me give you your schedule. You've done a job of explaining the case. I don't know what the answer is. I think this is an interesting problem.

All right. Initial disclosures, you've got to do it right. I'm not going to make my speech again. I'll give you until March 31.

Have you done it already?

**MR. WAKEFIELD:** We have, your Honor.

**THE COURT:** All right. I'm going to give you a few extra days to beef up your disclosures.

May 29 is the last date to amend your pleadings, to seek leave to amend your pleadings or add new parties.

You wanted a private mediator, is that correct?

**MR. WAKEFIELD:** That's correct, your Honor.

**THE COURT:** Okay. I'll give you until June 30 to actually do the mediation, but you need to select the mediator and have him on calendar, on your calendar and their calendar, by March.

Do you understand what I'm saying? So you've got to start -- you've just got to get it lined up by March 31, but you don't actually have to do it until June 30.

**MR. WAKEFIELD:** Understood.

**THE COURT:** I mean, do the mediation.

Fact discovery cut-off, October 30.

The last date to do your expert reports, if you have the burden of proof on the issue, October 30.

And the last day to file a summary judgment motion, December 3. I know what you're thinking. You're thinking holidays, but somebody has got to do some work in December. So here we go, December 3rd.

Final pretrial conference will be February 3, with your trial on February 8. Jury trial 7:30 a.m.

And you have your private mediator.

All right. Now, I want you to know I -- in fact, I think your firm was in it, the Boies Schiller firm was in this case, and I learned a lesson. I just do the final pretrial conference pretty close to the trial. So if I knock out your damages study or I knock out your -- you don't get a second shot. It's just gone. So you've got to do it right the first time. Please don't be greedy and ask for lots of money that I'm going to knock out maybe, depending on -- I don't know.

If you ask for a -- if it's all done in a reasonable way, then I don't knock it out. But if I have to knock it out, then

you don't get a second shot at it, except in very rare circumstances. So that's why the pretrial conference date is five days before the trial date.

Okay. There we are. You want to talk me out of these dates? I'm all ears.

**MR. WAKEFIELD:** No.

**MR. MARGIOTTA:** No, your Honor.

**THE COURT:** So that means a year from now we will be in trial on this case.

**MR. WAKEFIELD:** Excellent, your Honor.

**THE COURT:** That's great. I think I had Becton, Dickinson in a patent case, but -- were you in the Therasense case?

**MR. MARGIOTTA:** Which case?

**THE COURT:** Therasense?

**MR. MARGIOTTA:** No, your Honor.

**THE COURT:** I'm sure you were -- you weren't, but your client was. Seems like you were. And that case did go to trial. And the reason I remember, it involved blood tests, kits of some sort for blood tests. It's kind of like the same product line thing.

**MR. MARGIOTTA:** It's a very important product line to the client.

**THE COURT:** I can imagine.

I'm going to type it up. We'll be off and running.

Welcome to both sides. Good luck to both sides.

Thank you.

**MR. WAKEFIELD:** Thank you, your Honor.

**MR. BAGLEY:** Thank you, your Honor.

**MR. MARGIOTTA:** Thank you, your Honor.

(Proceedings adjourned.)

**CERTIFICATE OF OFFICIAL REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Debra L. Pas

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, March 19, 2015